The next case this morning is 522-0732, McNicholl Counseling, P.C., DBA, The Rock Counseling Group v. Jenkins. Arguing for the appellant is Matthew Hector. Arguing for the appellee is Phillip Pence. Each side will have 15 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Court will first hear from the counsel for the appellant. Please state your name, counsel, and you may proceed. Thank you, Your Honor. Matthew Hector on behalf of the appellant. May it please the court. This is a case about a restrictive covenant, a non-compete agreement that fails to protect the interest it seeks to protect. And the injunction that was issued that fails to protect, sorry, that fails to perform the role. Let me start over. The injunction that also fails to protect the interest that appellee seeks to protect. Effectively this, the injunction that's been issued in this case still allows for appellant to perform work via telehealth inside this 50-mile exclusion zone that the non-compete appellee seeks to enforce creates. Their argument is effectively that, oh, well, no one did telehealth when this contract was drafted, so it can't possibly envision telehealth. I don't get that distinction, and it's not borne out in the contract. Telehealth existed before COVID. It's been a thing that's existed for a while before COVID. It wasn't like Zoom was invented in 2020, and certainly there were other competing services prior to that. Mr. Hector, are you familiar with the new act Illinois adopted called the Ensuring a More Qualified, Competent, and Diverse Community Behavior Health Workforce Act 405 ILCS 145-1? I am not, no, your honor. When it took effect June 10th of 2022? No, I'm not familiar with that. Right, thank you. But at any rate, the distinction here is that effectively we're trying to prevent Mr. Jenkins from competing by preventing him from servicing people within this radius that the appellee has set, but we're allowing him to service those people as long as he's not physically present with them. So we're not actually protecting from any competition. The agreement fails to protect an interest fundamentally as an agreement, and the we're allowing the competition to occur. So it's a flawed document from its inception, but that notwithstanding, I don't believe that this telehealth exception was reasonably calculated to do anything other than try to address the elephant in the room, which is that in preventing appellant from seeing his clients, it cuts against public policy and public interest in a lot of ways. And I think that the low case from New York is instructive as to that. I think we need to look to the nature of the relationship between a social worker or a therapist and their client, and I think that is fundamentally different from that of, say, a cardiologist and their patient. I think a lot of the case law that we've seen cited by appellees relates to enjoining physicians from competing with each other. And I would submit that physicians are fundamentally more fungible than therapists and social workers. I've had a cardiologist do an angiogram on me. I can't remember the guy's name to save my life, but therapists and I have common interests we talk about on a frequent basis. So the relationship is very different, and I think it's much more personal and similar to that of an attorney-client relationship, which is what's highlighted in our brief. But the idea being that these are clients of Mr. Jenkins who have emergent needs that are best met by Mr. Jenkins. And if we're saying that telehealth is somehow okay, then it can't necessarily be also competing. If the injunction and the non-compete itself are to be, if they exist to protect an interest, then that would have to imply that by allowing telehealth, what we're is not that we didn't craft this contract with the idea that telehealth might exist. The contract is broad, and it could have been interpreted broadly. Instead, what we're saying is telehealth is somehow less than an in-person visit, and therefore it's not competitive. So either telehealth is just fine, and the needs of these clients are going to be met, and the public interest in people maintaining those close relationships with their therapists and social workers will be met, or telehealth is equivalent and incredibly competitive, and in which case the injunction and the non-compete failed to protect an interest to begin with. And that's the crux of our argument. I'm going to yield the rest of my time. I'm not sure I'm grasping what you're saying about the telehealth. Well, sure. As to telehealth, what I'm saying, Your Honor, is that if telehealth is just as good as meeting with somebody in person, and I can sit and talk to my therapist in person, and I have that physical in-person connection with him or her, with them, let's say, and I can sit there, I can see that human being, their presence is in and of itself calming and soothing on a certain level and facilitates that therapeutic relationship. Similarly, via telehealth, that isn't as present. I mean, I think that there's certainly, in the legal profession, certainly there are practitioners who say they prefer live depths and live trials versus Zoom depositions and Zoom trials for those same reasons. There is an inherent quality to in-person meeting with somebody that is different than a telepresence meeting. So either we're saying that appellants' clients who are currently unable to meet with him in their area without him traveling remotely and seeing them virtually, for those folks, what we're saying is that virtual visit is just as good as the in-person visit. And if that's the case, then we haven't really protected any interests whatsoever. And if they're not equivalent, then we haven't properly balanced the hardships here. We haven't properly really evaluated the impact on the general public that it sets a precedent that social workers and therapists, you can't depend on them to stick with you if they leave practices or shift jobs, sort of sticks them in one spot. I mean, it's similar, I would say, to attorneys not being able to submit to a non-compete, that people have the right to choose their counsel. And if I was to leave my firm, my clients arguably could come with me. And certainly that's happened when people have left our firm. They've taken clients with them because it's the client's choice. And similarly, I think in this scenario, you have people who are real human beings who have a need for treatment. And it's not something as, well, not like heart surgery is simple, but it's not something as, I don't want to say simple, but as one shot as a surgery, as occasional as specialist work with a physician. This is weekly, sometimes more than weekly sessions with an individual who knows you, who learns you and understands you. Redeveloping that rapport with a new person is very difficult. And certainly developing it via video conference is much harder than developing it via an in-person meeting. I hope that clarifies a bit on the telehealth distinction. What is our standard of review? Well, I believe it would be de novo in this sense. I mean, it would be an error review standard. Whether the court abused its discretion would be, I believe your standard here. I don't, you know, I believe the court did because there was evidence in front of the court that there would be an impact on the general public that wasn't fully addressed and that it erred in balancing the hardships. Any questions from the Justice Fund? Okay. Mr. Hector, is the gist of your argument that because telehealth allows contact within the non-compete covenant that it doesn't accomplish anything? Or is your argument that this is violative of public policy, that there is an intimate relationship between a social worker and their client and this whole contract is improper? Well, I think it's both to the extent that, you know, the intimate relationship is such that I think the entire contract is improper. However, there is no case law in Illinois to the law or case that's the one bit of persuasive authority we found that we thought was relatively on point. But ultimately, if that argument fails, then from a mechanical standpoint, allowing telehealth within the exclusion zone fails to protect the interest. And so the document itself fails, the underlying non-compete fails because it doesn't protect the business interest because it leaves this giant gaping hole. It's not the fox in the hen house. It's like the hen house has a huge wide open door. Any questions, Justice Welch? No questions. Counsel for Appley, you may proceed. Thank you, Your Honors. May it please the court, counsel. We're here today to discuss affirming the trial court's order granting the preliminary injunction to enforce the restrictive covenant between the parties. And today's guiding inquiry, after looking through the briefs and hearing from counsel, I want to focus the court's attention that we're not here today to discuss the business interests of one business against another competing against the interests of access to one particular therapist in Illinois, because that's not the law in Illinois. The question for today that I'd like the court to focus on is whether the contract that Mr. Jenkins signed was reasonable and enforceable. Mr. Jenkins, the defendant, chose to enter in that contract. He chose to start a competing business less than two miles from the plaintiff, and he voluntarily chose to violate the agreement, and it must be enforced against him. Doing so will mitigate the damages of his willful violation of the agreement, and it will not seriously diminish access to mental health treatment in East Central Illinois. And that's the standard in Illinois. Now, the evidence is going to... I note you do not appear to have cross-appealed this carve-out for telehealth. Do you mean not cross-appealing? In other words, you're okay with it. That's correct, Your Honor. I believe that's within the discretion of the trial court. And I want to say, actually, one thing that appellant's counsel stated, that the agreement could have been interpreted broadly. So if you look at the language of the agreement, which is in the record at C-18, it focuses on restricting the activities of the employee, which is Mr. Jenkins, and it says that the employee cannot engage in a competing business within 50 miles, and it defines what a competing business is. Now, that language, I have to admit, and as I think it sounds appellant would agree, could have been interpreted broadly. It's ambiguous. And so I think you have to interpret that against the drafter, which is the ROC, the appellee in this case. So when that question arose before the trial court, and it became within the discretion of the court as to how to enforce the agreement, plaintiff conceded that yes, the agreement likely does allow for telehealth. Now, whether or not the parties contemplated that when they entered into the agreement or not, it's unclear, but the document itself does not specifically state any kind of carve-out, and it doesn't state whether or not it's going to be binding across the non-signatories, which are Mr. Jenkins' patients. The contract is between the plaintiff and the defendant, and the restriction is as to the employee, which is Mr. Jenkins. So when the trial court asked the parties, is telehealth allowed? The answer that we had to conceive was, it doesn't seem to be prohibited by the contract, and it can be interpreted to only restrict Mr. Jenkins, which means he cannot be within 50 miles, but it does not restrict his patients. So with that interpretation, it was within the court's discretion to make the ruling that it did, and enter the agreement allowing Mr. Jenkins to be outside of 50 miles, but to see any of his patients. Okay, thank you. And you agree that it's an abuse standard? It's a split standard, your honor. So enforcing the preliminary injunction is de novo review, or sorry, abuse of discretion review, but in order to enforce the restrictive covenant, that's an standard of whether there's an inadequate remedy at law, and whether irreparable harm will occur, that's an abuse of discretion standard. And whether the other elements would go to de novo, so that would be, is the agreement reasonable? And balancing the hardships, potential for public harm, those are all de novo review. But let's talk about reasonable, then you have a 50-mile radius, which is 100-mile diameter, so you're barring the appellant from practicing in Vermillion County, Danville, Decatur, Bloomington, Champaign. That's a pretty large area that he cannot practice in. Well, your honor, the Mohanty case from the Illinois Supreme Court, Mohanty v. St. John's, discusses the reasonableness in this specific circumstance. So as the parties have briefed, and we've talked about briefly today, there is no case law specifically as to mental health therapists. And so looking at Mohanty, the standard they use for reasonableness for licensed professionals should apply. So the reason that I would suggest to the court that there's no specific body of law regarding therapists is because there is a body of law regarding licensed professionals, and that would be those regulated by the Illinois Department of Financial and Professional Regulation. So that would include doctors, that would include licensed clinical social workers like Mr. Jenkins. Are you familiar with the law, I asked Mr. Hector, about the Ensuring a More Qualified, Competent, and Diverse Community Behavioral Health Workforce Act, 405 ILCS 145? I am not, your honor. Well, in that law, the General Assembly found that there's a shortage of health care workers, shortage of clinical staff, mental health, health care jobs, found an unfilled vacancy of likely to reach 8,353 by 2026. Doesn't that say the General Assembly's public policies established that we should have more availability of social workers and health care workers? Yes, your honor. And I think that what the balance that the trial court has struck here still meets that need, because the evidence that we saw at the trial court and the evidence that's properly before the appellate court discusses this issue of the geographic scope and the duration of this. And so the law in Illinois under the Lawrence case is the geographic restriction is reasonable if it's coextensive with the party's business interests. And so the evidence we heard at the Champaign-Urbana area, from its principal place of business in Champaign. So if you take 50 miles on Google Maps from the Rocks business, that would allow Mr. Jenkins to practice in Bloomington. That would allow him to practice on the west side of Decatur. He could practice in Mattoon. So there are other areas where he could maintain an office. And I believe that the trial court, in attempting to balance the potential for public harm and interpreting the agreement in a way that allows for telehealth, specifically carves out a way that there is no denial of access to Mr. Jenkins' clients who may need him. It was an issue that the parties discussed extensively and the preliminary injunction hearing became largely about the potential of public harm. And I can't explain exactly why the trial court issued its order in the way that it did, but I think that placing the burden on Mr. Jenkins to be outside of 50 miles, but allowing him to see anyone who wishes to see him within the 50 miles correctly strikes that balance. So someone sitting in Champaign or someone seeing him in person, for instance, in Decatur, they're not going to be denied access. And in fact, as the General Assembly and as defendants cited in their brief, the Illinois First Responder, excuse me, let me get down to it. The Illinois First Responder Mental Health Act, I believe it was, specifically includes statutory language to encourage mental health therapists to increase access through telehealth. And in doing so, I think that balance is properly struck here, that if there's any burden that falls on one of the parties, it falls on Mr. Jenkins, who willfully decided to leave his job. This is not someone who was terminated and is out looking for work. He set up a business before he left. He opened his business less than two miles from his former employer, and he's trying to take patients away from his old employer to his new employer. Now in doing so, if you're going to place the burden on anyone, it should be on Mr. Jenkins to be more than 50 miles away and to conduct any practice he needs to see anyone in Champaign or this area via telehealth. And I think that that's supported by the public policy of the Illinois First Responder. And Your Honor, I think it's important that we also briefly discuss this evidence issue of what's properly before the court today. So the trial court has wide discretion in how it will conduct a evidentiary hearing for a preliminary injunction. So the the initial preliminary injunction hearing was postponed to allow him to submit a brief, and then we held the preliminary injunction hearing on October 31st. Now in that time, the plaintiff submitted a verified answer, and it submitted affidavits in support of its motion for preliminary injunction. The defendant did not submit a verified answer, and while it submitted an opposition brief, it did not submit the affidavit of the defendant himself, Mr. Jenkins. So there was no sworn evidence before the court opposing our motion. And that was discussed at the outset of the preliminary injunction hearing. The court asked the parties to reach agreement on what evidence was properly before the court that day, and everyone agreed that it was the answer in the affidavits of the plaintiff, or sorry, the complaint in the affidavits of the plaintiff. And from there, Judge Dyer and the circuit court began an evidentiary hearing, and Mr. Jenkins himself was present with counsel that day and could have given direct evidence testimony, but elected not to. So they had opportunities to put evidence before the court, but instead relied only on legal argument of counsel. So the record that we're left with on appeal, what was actually before the trial court in issuing this order, is only the verified complaint and the affidavits and supporting exhibits of the plaintiff. And on that limited appellate record, the court can make conclusions of law for the de novo review, but the record evidence itself only supports enforcing the restrictive covenant in this case. And beyond just the geographic reasonableness that we've already discussed, there's also evidence submitted in the affidavits of the duration being tied to the amount of time it takes to build a successful practice. When a new clinician joins a practice as a licensed social worker, they have to be supervised before they can become a licensed clinical social worker, and they have to build a patient panel. And the supporting evidentiary record shows that it takes approximately two years to get a practice fully up and running. So that's why the two-year restriction is in place, and the plaintiff has presented evidence on that point. The defendant presented no evidence in opposition to that point. Mohanty case also discusses balancing the hardship between the parties. As the trial court properly referenced, because Mr. Jenkins' violation is willful, the court is not required to balance those hardships. But even there, I would ask the court to consider that the potential hardship here, if any, should fall on Mr. Jenkins for making the decision to open a competing business and to willfully compete against his former employer. And then on the significant point of balancing the potential for public harm, which is the de novo review standard, again, I believe the Mohanty case is guiding on this point, because the standard in Mohanty that the Illinois Supreme Court has put forth is whether or not the public will be deprived of access from mental health therapists, licensed professionals, whether or not it will be significantly diminished. And in this case, not only are there other competing groups in the area. So my client, The Rock, has an office in Mahomet and in Champaign. Our client's affidavit has stated that there's another mental health therapist in the small town of Mahomet that provides the same services to veterans and first responders. So you're talking about a small town of Mahomet that has at least two groups providing services to those with mental health needs for veterans and first responders. And beyond that, the balance that the trial court has struck even allows for Mr. Jenkins himself to continue serving his clients if he will be the one that bears the burden to drive outside of the 50-mile scope. So on that point, I believe that the trial court has properly struck the balance, and the law shows, even on a de novo review, that Illinois law favors enforcing this agreement. And then the last points that plaintiff needs to establish to enforce restrictive covenant is irreparable harm and inadequate remedy at law, which are the abuse of discretion standard, which the trial court got right in this case. So first of all, it's agreed in the contract on page C-19 of the record that if there's a violation of the covenant, the parties agree that there will not be an adequate remedy at law and that there will be irreparable harm. And Illinois law allows for the parties to contract on this point, which they have. But even beyond that, the proper decision by the trial court was that business interruptions are harm in Illinois law, and that's the Strenstrom Petroleum case, and that when they are of a law. And so all of the elements required to receive the preliminary injunction have been met, and all of the showing put forth by the plaintiff, none opposed by the defendant, have shown that this contract is reasonable and enforceable. And for those reasons, the appellate court should affirm the trial court's judgment. Thank you, counsel. Any questions, Justice Vaughn? Do you want time to brief the act I referenced, or do you think that applies in this case? Having not had the opportunity to read it, it may be worth supplemental briefing, but I can't say sitting here, so we may want to reserve the right to brief that. All right, thank you. Justice Welch? No questions. Rebuttal. Yes, thank you. First, I'd like to just point out that notes that it takes a long time to build up a practice. And so, to make the argument that there's an immediate harm here, I think that it's a little disingenuous if it takes that long to build up a practice, and Mr. Jenkins is an individual. Him competing against a large entity doesn't seem to really do them that much harm. But regardless, I think the crux of this is that the agreement doesn't prevent competition. So, it can't be valid because it allows for the telehealth competition, which if counsel has pointed out that the statute we cite in our brief, the Illinois first responders mental health statute, it does state that telehealth is an avenue that should be made available to first responders. And I don't think that is necessarily the same as saying that it's equivalent to an in-person visit, but certainly that is in the statute. So, if it is that great, and arguably is, then it is competitive. And there's not really any point to the injunction, really, I think. And I think the biggest problem here is that considering a telehealth just as good here really eliminates, again, that in-person element of therapy. And the biggest piece to it would be that when someone's in crisis, if you have a patient in crisis, a client in crisis, and they are thinking about self-harm or similar, I think access to a person in person is significantly more important than the ability to get them via Zoom. And I think that that's a very key distinction there. With regard to counsel's arguments about regulating therapists and social workers like any other licensed professional, I'd like to point out that IDFPR, in addition to therapists and physicians, they also license detectives, cosmetologists, barbers, accountants, architects, dentists, veterinarians. So, it's a relatively broad, broad, broad standard to say that we're just going to license professionals, because there's a ton of those. And in fact, very many of them are completely dissimilar from each other. They're not even, it's such a broad category that we can probably point out all the differences easier than we could all the similarities between each of these professions. Other than that, they all hold a license regulated by IDFPR. And the distinction here that is more important is that this is a mental health-based issue. And the statute that I would also believe that we might be worth additional briefing, because I had a few seconds to skim it. And it does look like it may be relevant to the question that IDFPR. But I think that ultimately, what we're looking at here is not a question of whether this, whether the ROC is being harmed by Mr. Jenkins's competition, but whether the injunction even prevents competition, and whether a therapist or social worker should be enjoined from treating their clients. I believe this is nothing further. Okay, thank you, counsel. Any questions from Justice Baum? Were you asking them for time to brief that act? Also, Mr. Hector? I mean, I skimmed the preamble of it. And it seems like, yes, there might be something in there that is relevant to this, but I haven't. I mean, reserving the ability to do so, I think, would be, I'm going to punt as counsel did, because I think it is relevant. Do you want to brief it or not? Well, yeah, absolutely. I mean, I think it could be useful, because it does look like it's on point. Justice Welch? No questions. Okay, the court will take the matter under advisement and issue its decision in due course. And as to the additional briefing on that point, we'll confer on that and issue an order if we think that's necessary.